Good morning. Good morning. I am Robert Reifenberg. May it please the court, I am Robert Reifenberg on behalf of the appellant, cross appellee, Illinois State Medical Inter-Insurance Exchange. Eight years ago, this very court, specifically Justice Tice writing for the court, handed down its opinion in what parties have referred to in their briefs as CHIRP 1, the first appeal between, of this very case, between Chicago Hospital Risk Pooling Program and what I will This court very clearly held that notwithstanding CHIRP's status as a not-for-profit risk pooling program, it was nevertheless subject to the traditional common law duties of a traditional commercial insurance company. Among those duties specifically at issue in this case was the obligation to recognize target tenders from its insurers and the consequence of target tender estoppel if CHIRP did not recognize that duty. Now, that should have been the near end of this case because that was really the seminal issue involved, whether CHIRP could or could not be subject to the target tender rule. And in fact, if Justice Tice might remember, this case came up on appeal on a 308 certification where CHIRP agreed with ISMI, the parties agreed jointly, that resolution of that singular issue would materially advance the ultimate termination of the litigation. Yet here we are, eight years later. Did the litigation materially change after the opinion? Absolutely. Absolutely. Did it change? Got a new complaint. Pardon me? Got a new complaint with a new account. With a new factual predicate, which was immediately after remand, CHIRP totally reversed fields, said, please forget everything we said about us paying this settlement under a primary policy. It's just dawned on us. I don't know what the explanation is. But two-thirds of that settlement in actuality was paid under an excess policy. Now, this is the first time this revelation has come to light four and a half years after the settlement, four years after the initiation of this lawsuit by CHIRP. Now, we've never heard an explanation from CHIRP. Never. In the eight years that this amended complaint had been filed, never heard a single explanation for why it had to, what happened to change? Why didn't they realize that they paid it under an excess policy to begin with? And if we hear an explanation this morning, I submit it will be the very first time that we hear an explanation. But we don't really need an explanation because the reason is obvious. This is nothing, this amended complaint with the new factual allegation that the settlement was paid under the excess policy, is nothing more than an attempted end run around Your Honor's opinion in CHIRP 1, an attempt to escape the target tender estoppel rule. Can I ask you a big question? Yes. In the hundreds of pages of briefs in this case, one way to look at this is that you've analyzed a lot of trees. There's a lot of discussion about very specific issues. I think you raised 15 issues. Your opponent raises 22. Not a lot of forest is discussed here. And I'm going to ask you a big forest question. All right. A lot of what you've argued, specifically right now, is about the history of this case and the changing positions. You've used words like estoppel, I think, probably. I'm not sure if she really did. But equity, all those kind of ideas, certainly you seem to be moving toward discussing. So my first question to you is, can you give me some background about why, in the context of co-insurers, we analyze their relationship based upon these equity principles? In other words, they're not in contract with each other. Probably they are competitors in the market. And yet, we see all of this language through the cases about equitable contribution, like subrogation, waiver. You want to talk about mend the hold, whatever that means. All these equitable ideas. Why are they there in relationship to co-insurers? Well, I think they're not always there with relation to co-insureds. But they're there when one of the co-insureds files a complaint for equitable relief, which is, it started off in this case, equitable contribution. No, I'm not sure you said. I mean, a lot of this is talking about the relationships and the letters that were written between the parties early on, long before the complaint was filed. A lot of discussion about whether or not there was full disclosure, et cetera. So certainly there seems to be some discussion about throughout the history of this case, not just in the pleading, that both parties were required to treat each other with a degree of fairness, a degree of equity. And if they don't, then they're barred in the future from changing positions. Where does that idea come from? I don't know where it comes from originally, but I would go back to my original answer that I think where you have co-insurers, they're separate contracts. They're not in privity with each other. Then the only remedy is an equitable one. And in order to come into the court of equity, both parties have to have clean hands. Both parties have to act equitably towards each other. And I think that's the best that I can answer. So percolating under all of these factual and legal issues, and there's quite a few, as Your Honor has indicated, is I think a very basic issue, which I would submit needs to be resolved by this Court. Can CHRP do what it did? Can it allege for four years in litigation that it paid under a primary policy, get an adverse ruling on target tender from this Court, go back and reverse fields and allege something completely different that no one had any inkling of, that they never advised ISME or its insured of at the time of the settlement or at any time thereafter? Setting aside issues of mend the hold, equitable estoppel, those types of things, I would submit that the answer is very clearly no, CHRP cannot do this because of what the Supreme Court said in Home Insurance v. Cincinnati. At the time of the settlement, of the time that CHRP paid the settlement on behalf of the co-insured, Dr. Baldeceda, it had an obligation to advise ISME, the co-insurer, that it was paying under an excess policy. The Court said, an insurer's failure to advise another insurer at the time of settlement that funds are being paid under an excess policy is waiver of any claim for reimbursement under that policy. So it's clear waiver. It's clear waiver. They may not seek equitable subrogation as the... So you're asking for a specific rule that in this kind of situation where an insurer is both primary and excess, when a settlement is made, there must be an allocation or they are barred from seeking any kind of reimbursement? Not only allocation. Allocation is a little bit down the road. Yes, they have an obligation to allocate so that we know... What I'm saying is they have an obligation to say, we are paying some of this settlement out of an excess policy. So be aware, ISME, because your remedies may not be what you think they are. You may not have a defense to target tender. There's a reason that the Supreme Court has set down the rule in Home v. Cincinnati that an insurer, a co-insurer, needs to advise the other co-insurer about payment under an excess policy. So I've gotten a little bit ahead of myself in terms of that specific issue. And since my time is short, I thought perhaps what would be of most benefit to the Court is if I just because I would submit that the law is very clear. I don't think that there's a lot of novel legal issues here. I think, however, the facts go back 10, 11 years, and I would like to discuss those just briefly. This lawsuit was brought by CHIRP against ISME seeking to recover initially one-half of a payment it made on behalf of a co-insurer, Dr. Baldassada. CHIRP alleged for the first four years in that lawsuit that its payment was made under its primary policy and it wanted, under the theory of equitable contribution, one-half of that back, $500,000. Eventually, CHIRP amended its complaint after the CHIRP won and increased its damnum to two-thirds of a million. There are a number of reasons we contend that the trial court was in error in entering summary judgment in that amount, but let me touch on the facts. Initially, this lawsuit, this medical malpractice lawsuit, comes from, as your honors know, the birth of twins at the Norwegian American Hospital. There were two claims in this case, one for personal injury, one for wrongful death. Immediately, and this is uncontroverted, after being served with the summons and complaint, Dr. Baldassada tendered his defense to CHIRP. CHIRP denied the tender by claiming it was excess only, excess by coincidence, when the other insurance clauses were compared, and told Dr. Baldassada, in writing, in no uncertain terms, that he had to turn to ISME as his only line of defense here. Ten days later, only ten days later, this court issued the Padilla opinion, which was almost identical. It certainly was identical in terms of other claims. The court, however, said that these are, in fact, coinsurance, and it put CHIRP on note, CHIRP was a party to that case, put CHIRP on notice that its policy position vis-a-vis Dr. Baldassada was unequivocally wrong. CHIRP did nothing to rescind that declination. They did not file a declaratory judgment action. They did not defend under a reservation of rights. They continued to deny Dr. Baldassada's repeated, in writing, target tenders. Could you address here, I don't think you really had an opportunity to fully address the way this was briefed, the argument that is made that there is no duty to defend, so this whole idea really doesn't go anyplace. All right. The duty to defend is found in the CHIRP policy. The CHIRP policy was written by CHIRP, obviously. It is construed against CHIRP. Paragraph 5.19 of the policy states, CHIRP shall provide a list of approved attorneys or law firms from which each participating hospital shall select one attorney or law firm so listed to serve as primary defense counsel to said hospital or covered person of claims made against said hospital or covered person for covered losses. CHIRP contends that Dr. Baldassada was a covered person, he was in a hospital, and that the duty to defend does not extend somehow to cover. Well, certainly, the clear link, I mean, obviously, the trust agreement is not written like other policies we read, right? It's constructed in a different way. But there is a paragraph about defense, which is what, 5.17? 5.19. No, 5.7. The trustees shall have the right and duty to defend any suit brought against the hospital alleging a covered loss. Okay. That's real clear language. That's how we would look for duty to defend in another policy there. You're telling us to look someplace else. But let's look at the one place where it talks about the actual words, duty to defend. Hospital is also defined later in the policy in the appendices as including covered persons. I'm not sure that's corporate. Additionally, if you think about vicarious liability, how can CHIRP defend a hospital? Even if you construe it as brick and mortar hospital, a corporate entity, and none of its agents, how can CHIRP defend a hospital if it is sued for vicarious liability as it is in 99 percent of these cases? Is it sued, was it sued for vicarious liability in the Rivera case? Yes. What count? All counts. All counts. Really? Is the word vicarious liability anywhere in the Rivera complaint? I don't think so. I would have to look. But the nurses were sued as agents of the hospital. The doctors were sued as agents of the hospital. I believe so. I believe that's true. The theory is that they're unified tort fees. Is that correct? I'm sorry? Your theory is that they're unified tort fees as if they're being sued in a vicarious capacity, and therefore, in order to defend the hospital, you necessarily have to defend the agent. Absolutely. What if they had refused to defend the agent? What if they had refused to defend the nurses here, saying they're covered persons only? A default judgment's entered against the nurses go without a defense. Default judgment's entered against the nurses. It's enforceable against the hospital. How is that defending the hospital? The hospital here was sued in the Rivera case for its individual corporate liability, correct? Its individual corporate liability? I believe it was vicarious liability. I don't think so. That's not the word to say in the complaint. I would have to go back and look. But I don't know that there was an individual act of, there was no allegation in the Rivera case that the hospital's board of management somehow inadequately staffed the labor and delivery room or anything like that. It was all vicarious liability, as I recall. Although, obviously, it wasn't involved in the case. I would also state that on that point that Justice Hoffman raises about you cannot defend a hospital without defending the agent in a case of vicarious liability. The American Family v. Enright case speaks to that point. Getting back to the facts, CHRP repeatedly denied the tender of defense, target tender, even though it knew it was wrong. And there's unequivocally no doubt about that. Their own claims person said, yeah, I had an obligation to withdraw an inaccurate declination letter, but I can't remember if I knew about the Padilla case or not. I would submit that the CHRP would be charged with institutional knowledge of the Padilla case inasmuch as they were a party to it. Eventually, Dr. Baldeceda was forced to file a declaratory judgment against CHRP. And in it, he said quite clearly, I want CHRP to defend and indemnify me, not ISME. In response to that declaratory judgment action, although CHRP had previously declined Dr. Baldeceda's defense, they went out and settled the case on behalf of all three of its insureds, the hospital, Dr. Baldeceda, and Dr. Nyguen. And ISME didn't participate in any of the settlement discussions? It did not, because that would have been, correct, it would have been against the wishes of its insured, Dr. Baldeceda, who had repeatedly target tendered CHRP. But aren't we here saying that there are some times where there can be exposure by a co-insurer, even when there's target tenders, and that's where we are today. In any case, ISME made a choice. Even though its own internal peer review people said this is going to have, probably this liability is going to be a great deal of money, ISME chose not to participate. ISME, I don't know if it chose not to participate, ISME chose to abide by the wishes of its insured. It had no, it could not do otherwise under the law of target tenders. An insured has the, has the So you couldn't protect yourself. Let's say you knew that the target tender and, my math is going to get bad here, is a million dollars, but your own internal assessment of the case is it's worth 15 million. You realize you might have a problem here. ISME might have some exposure in this case. And you're saying there's, ISME could not in any way try to control that? That puts the non-target tendered insurer in a pretty bad position. ISME always had the option of acting as an excess insurer. That target tender does not reach. And ISME, if the settlement would have been in excess of CHIRPS, I would submit three million dollar primary limits. And in excess of its excess policy, then if ISME chose to do that, they could come in and participate in a settlement if that's what it would have, if in their judgment that's what, that was the reasonable thing to do. And that would have been consistent with Dr. Ball's wishes. They cannot act contrary to the wishes of its insured. That's what I believe Institute of London and all, and its progeny all recognize is the insured's paramount right to choose for all those reasons. He may not want to increase his premiums. He may not want to increase his insurance rating with his own, with his insurer, with his own personal insurer. Where he has, where they are coinsurance, the insured has that right to choose, and the insurer cannot go against that. Can I ask two other questions? Sure. Kind of different areas. Let's talk about allocation. One of the issues here is about the affidavit. Yes. That was provided here that the trust administrator said this is how we did it. Years ago, this is what we did. Correct? And you are objecting to that? Moved to strike it. There's a second affidavit in the records, is there not? In which he says that he was, has been the trust administrator since 1986. Is that true? I think there is that affidavit. Right. But that, nowhere in any of those affidavits, and he submitted, Mr. Skurdage submitted numerous, more than two, does he ever say he was involved in the settlement of the Rivera case? And the case law we cited said, says that it's all well and good that he's the trust administrator, but if he wasn't involved in the settlement, and he never says that he was, then the affidavit is not sufficient under 191. Let me ask you this. There's a lot of discovery that was done. Yes. And that sort of stops. No one ever, you're never closer to Poloskirch to ask for any documents about, that were generated contemporaneously with this alleged allocation? No. You made the choice not to do any discovery about this issue. No, that's not, that's not accurate. We, we chose not to depose Mr. Skurdage because his affidavit in our judgment was inadequate, insufficient under 191 on its face. We asked for all affidavit are all documents, and under 191, he has to attach to his doc, his affidavit, all documents upon which he relies to, to say, this is the way the settlement was allocated. I have attached correspondence from Chirp's attorneys, where they say there are no documents other than the claim file disbursement certificate, which is the document that was produced shortly after Chirp amended its complaint after Chirp won. That is the only document. Now, if this court were to allow, the, the basic bottom line is allocations have to be in the settlement documents. They cannot be created after the fact. It, and if we go back and look at the settlement documents, and I've, I've itemized them in the briefs, what they are, there is no allocation. There is $1 million apiece for each of the three Chirp insureds. Wait, wait, wait, wait, wait, wait. Aren't there four? Four? Insureds? No. Well. The hospital? The hospital was sued. The nurses? The two doctors? And is, doesn't the settlement say a third, no, whatever it is, $1 million for the hospital and the nurses? Correct. $1 million for the doctors, $1 million for the other doctors. Is that right? Right. Right. Yes. It's allocated in that way. And the personal injury case is allocated $2 million, $2.25 million. The wrongful death case is allocated $750,000, but there is no specific allocation to Dr. Baldeceda. We don't know if he was allocated $1 or $749,000 for the wrongful death case. Why is that important? Well, the evidence in the case shows that unfortunately the decedent was most likely expired before Dr. Baldeceda was ever called into this case. Prejudices, there's a reason for allocations. There's a reason. And that is it allows a co-insurer, for example in this case, to challenge the settlement. We can't challenge it here. We don't know how much was allocated for him. We can't challenge it. So there have been prejudiced in that regard. Can I ask you one other question? Our time is running out. Have you ever seen language quite like the occurrence language in this policy? It is similar to the related acts provision in the cases that we cited in the brief whose names I can't recall at this point. But there is, Your Honor raises a very good point. There was clearly more than one occurrence here. My point is what is the language of this policy? And how are we supposed to interpret it? And then secondly, how do the other cases that you direct us to that do not have this language, how do they work with what we do have? CHIRP says that its occurrence definition, there is a single occurrence available when multiple CHIRP insurers are participating in the same service or activity. And that CHIRP would say that the nurses who were accused of, for example, not providing adequate intravenous fluids, Dr. Baldaceta, who, for example, was accused of not taking an adequate history, Dr. Nyguen, for example, who was accused of not timely performing a C-section, they are all involved in the same service or activity. Maybe it's even broader. All damages arising out of all acts of omissions in connection with the same service or activity. Lots of very broad words in that term. Very vague, broad words. Very vague. They are construed against the drafter. I don't... Hold on. Wait, wait, wait. This was a summary judgment issue. You don't use rules of construction unless the document is ambiguous. If the document is ambiguous, it's not proper for summary judgment. It's a question of fact. It has to go to the trier of fact. So if your argument is that this document is ambiguous on the question of service, what does it mean? And in that particular case, the argument ought to be that this should not have been a summary judgment. This should have been a matter addressed at the trier of fact. But you can't make the argument that rules of construction are to be applied to it, not in a summary judgment. I understand. I guess my argument is summary judgment is inappropriate here for CHRP on the issue of single occurrence. I think that the law in Illinois under Doe v. Isme is that we look to causes. We look to causes, particularly in medical malpractice cases. With different kind of language. I just have to go back to that. When you read Doe, Doe is a claims-made policy. These are claims-made policies. This is a claims-made policy. This is? Yes. CHRP's policy is a claims-made policy? Yes. Where do you get that from? It just is. I'd have to look at the... It appears to be an occurrence policy. In terms of the... Liability is triggered. Liability for CHRP is triggered if the occurrence took place while the policy was enforced. It is not triggered if the claim is made at the time the policy is enforced. That's the difference between a claims-made policy and an occurrence policy. No, I understand that. I'm sorry? This appears to be an occurrence policy. Okay. I'd have to go back and look. I'm sorry. It's an issue I didn't focus on. But it's one that was claims-made. Claims-made. We're trying to work with you here. There are a bunch of cases out there, but they don't quite fit here exactly. So what parts can we take from them and what parts can't we take from them? Well, let's just look at the language, same service or activity. And I'll make the point that I made in the briefs. If same service or activity is construed to include not only what Dr. Nygren provided, he didn't provide any labor services, labor and delivery are two separate services. All right? If you construe this to say that doctors who practice under these set of professional rules and standards of care and nurses who provide nursing care cannot practice medicine under law are providing the same service or activity, then I think we have a problem in construction. I don't think that legally doctors and nurses, particularly under these facts, were they were not providing the same service or activity and were not in connection with the same service. What does that mean? Or rising out of. It's even more than that. Rising out of acts in connection with. What if from the time that Mrs. Rivera comes into the hospital, let's say she has a long labor or difficult course and it goes on for weeks and she's seen by multiple doctors in multiple specialties and CHRP comes in and we have a similar situation and CHRP comes in and says, we only had a million dollars. We only had a million dollars because all of these doctors were providing hospital care and that's our same service or activity. I don't think you can read it that broadly, respectfully. I don't think you can read it as broadly as to say labor and delivery are the same service or activity. Some allegations go to treatment of the babies. Some allegations go to treatment of Mrs. Rivera. They are clearly not the same service or activity. There was a single, there were multiple causes alleged here and multiple occurrences. A minimum of three. The excess policy did not have to pay. And if it did, it paid as a volunteer. Okay. We've got to go. You've got to give your opponent some time. Okay. Thank you very much. Thank you. May it please the Court. Rebecca Holler on behalf of Chicago Hospital Risk Pooling Program. I'm here today to talk to this Court about why the trial court was correct in ruling in CHRP's favor with respect to the equitable subrogation count, which was a count that was deducted from the alternative to its equitable contribution claim. May I ask a question? Yes. My math is not so good, but I'm kind of basic on the law. What complaint are we supposed to be looking at? What theory of this case is before us today? With respect to the coverage? Equitable subrogation? Equitable subrogation. Which variation of what you've pledged, the Third Amendment complaint or the Second Amendment complaint? Under either, the equitable subrogation count results in the two different complaints. You ask for different numbers in the two different complaints. And that's why I'm real bad at numbers, okay? I don't understand. In the Second Amendment complaint, which was before the trial court, you had one set of numbers. Afterwards, you asked to amend to conform the plea as the proof, and you asked for a second set of numbers. I'm not sure. And then today, sometimes in your briefs, you're asking for other numbers. I'm really confused. Which one should we hold on to, as to understand what you are asking for? The Third Amendment complaint sets forth the equitable subrogation count, which seeks a recovery of $666,666, well, say two-thirds. Under the Second Amendment It doesn't really. It doesn't really, your Third Amendment complaint. For the amounts that were paid under the excess trust, which was $666,000. In your Third Amendment complaint, you asked in count one, equitable contribution, you asked for $333,000. Correct. Okay. And then in count two in the Third Amendment complaint, you say, you break it down this way. You say, oh, I take it back. You're right. It's in your Second Amendment that you have $333,000, and then second $333,000. And put those two together, and that equals $666,000. That's your Second Amendment complaint. You've changed that theory. Now, you're right. And this one is straight $333,000 under equitable contribution, and $666,000 under the subrogation. Correct? Yes. And the Second Amendment complaint, under the contribution claim, it was Ismead primary carrier, her primary trust, shares equally. So why do they say $333,000? They share dollar for dollar up to $333,000, which was the limits for the primary trust. So how much were you asking for in contribution in these two variations? In contribution, under count two, it would be. Under count one. Under count one. Equitable contribution, count one. Under the Second Amendment complaint. You ask for one-half of the settlement payment made on behalf of Dr. Bell-Deseda, the same $333,000. Therefore, you ask the court to enter judgment on behalf of $333,000 as to equitable contribution. Under equitable contribution, since you have two primary, well, one's a primary trust, one's a primary policy, they share dollar for dollar until one of the two primary trusts, there was only $333,000. So under the equitable contribution theory, under Padilla, Chirp and Ismead would share dollar for dollar. So they would each pay $333,000. And that would total $666,000. So then why are you asking for, so then wouldn't you be asking for $333,000 from the excess? That's how the Second Amendment complaint was filed. We were trying to incorporate both. But that's not the complaint that we're looking at now. You're asking for something else. The trial court asked us to amend to comply with his findings with respect to the $333,000 was correctly paid under the Chirp primary. And Chirp is not contesting that. It agrees that it owes $333,000 under the Chirp primary policy. The way it applied Padilla is it paid its $333,000. Ismead should have paid its $333,000. So there was $666,000 paid. And then the remaining $333,000 was paid under its excess trust. And why in your brief, when you do discuss contribution, that's why I stay there, on page 24 and 25, do you ask for $500,000? On page 24 to 25, when you're discussing equitable contribution, you say that, therefore, Ismead and Chirp should share equal liability, which would mean Ismead owes Chirp $500,000. If this court were to find that there were multiple limits available under the Chirp trust agreement, Chirp primary trust agreement, which we disagree with. Multiple services, each one providing a different service, so the Chirp policy would be $1 million per occurrence or per service, $1 million for the nurses, $1 million for Dr. Nygaard, and $1 million for Dr. Belicherry, your argument would be, if there were both primaries, it would be half a million apiece. That's correct. Tell me about home insurance, please. How do you distinguish it? Home insurance, when you look at the facts of home, you have two primary carriers. One carrier policy contained an excess other insurance clause. However, at no time during the course of the underlying litigation or during the settlement discussions did that carrier, which I believe was home, ever advise the other carrier or the insured that it was going to take the position that its policy was excess. In our case, Chirp, in its initial letter to Dr. Beldesita, explained that there were two trusts, one a primary trust subject to $1 million in limits, and then an excess trust in excess of the Chirp primary trust, and it further, Chirp's letter further advised Dr. Beldesita, and a copy went to the ISME retained council representing Dr. Beldesita. It went further to say that there was this excess trust, but the excess trust would not be implicated until both the Chirp primary coverage as well as the ISPE coverage was exhausted. So from early on in the litigation, Dr. Beldesita, as well as ISME, was aware of the two different trusts. One was a pure excess trust. One was a primary. In Home v. Cincinnati, that information, as far as Home taking the position that it was excess, never came out until the litigation. I'll let in our case where after the letters exchanged, and, yes, indicate that there is such a thing as the excess trust, you file a lawsuit asking only for equitable contribution, asking only for $500,000, and you attach only the primary trust. And you rely on that all through the trial court and all through this court. Why is that not conduct inconsistent as Home says with your request for reimbursement? In the original complaint, it does set forth how much was paid for the entire settlement. Three million was paid for the entire Rivera settlement, a million dollars on behalf of Dr. Beldesita, a million on behalf of Dr. Nagayan, and a million on behalf of the hospital and nurses. It attaches a primary trust. And in the primary trust, it does say that amounts in excess of a million dollars are paid under the excess trust. At the time the contribution claim was filed,  whether or not it was subject to a selective tender doctrine, which really was an important issue to guide the rest of the litigation, as well as whether or not CHRP as a trust could pursue equitable theories, such as those that other carriers are able to pursue. So those were core issues that needed to be decided. It wasn't a question of whether you paid under your primary policy or you paid under your excess. You wouldn't be seeking equitable contribution if you paid under your excess policy. You'd be seeking equitable subrogation. So if there was a question at the time that you filed your action as to whether you were entitled to equitable contribution versus equitable subrogation, that means that you're in a quandary as to the meaning of service in your own policy, aren't you? If this Court had ruled that their selective tender wasn't applicable, the case would have proceeded on the equitable contribution count. We wouldn't have had to. That wasn't my question. My question was if you necessarily had to be in a quandary as to whether you had a million dollars in coverage for a single occurrence, a third, a third, a third, or you had three occurrences with a million dollars apiece under the terms of your primary trust. You'd necessarily have to be in a quandary if you pled those two in the alternative, wouldn't you? Well, ISBI was taking the position that there was multiple occurrences. We disagreed with that. But the equitable contribution count avoided the need to even have to deal with the issues of how many occurrences. Litigation could have been very streamlined and resolved probably early on. However, there turned out to be additional issues that needed to be pursued. At that time, CHIRP chose to amend its complaint to assert both the equitable contribution if ISMI was correct and how many limits were available as well as the equitable subrogation count based on how CHIRP had allocated the limits to under the primary policy as well as the limits under the access policy. In order to agree to equitable subrogation, one necessarily has to find that there is a single service, a single occurrence. That's correct. But there seems to be a dispute as to what single occurrence means. Well, I don't think there's a dispute. I think the language in the trust agreement is clear as far as making all ambiguous. There's no ambiguity whatsoever as to the meaning of the occurrence. Particularly in the context of this being a trust devised for hospitals. And look at who's taking issue with this language. It's a stranger to the contract who's trying to avoid their obligations under a policy. This is still a summary judgment. This was not a trial. If this were a trial and the court found that as a matter of fact there is a single occurrence, that's a different argument. This is a summary judgment proceeding. That means necessarily the court must have found, number one, as a matter of law, the policy was unambiguous. And number two, under that unambiguous language, there is but a single occurrence. That meaning the CHRP paid $1 million on its primary coverage and all the remainder was paid on its second. They would necessarily have to find that as a matter of law. That's correct. And we believe that the language in the CHRP trust agreement regarding each occurrence, all acts are omissions in connection with the same service. And so you have a woman who presents in labor. What she's complaining about in her complaint is the fact that they didn't recognize the signs, early signs of distress during her labor. They didn't deliver the babies soon enough or the babies soon enough. So it's the care and treatment of the mother in the labor and delivery that's at issue. So the fact that there's multiple doctors, multiple nurses providing care to Ms. Rivera, the complaint is seeking damages based on that care. All acts and omissions related to the labor and delivery are a single occurrence subject to $1 million. I agree with my concern about how the original Rivera complaint was drafted as to the hospital being, the allegations against the hospital being institutional negligence and no language about vicarious liability in the complaint. The allegations are against multiple defendants, including the hospital. And in the various acts of negligence, there are allegations of failure to have appropriate chain of command. So there are some. For the nurse. Well, for the hospital as well as the nurses. Unfortunately, I can't find it. Read the Rivera complaint. I'm going to see that it talks about conduct by the hospital in relationship to its agents. Let me just try to help the Court on this. The allegations are against the hospital. I mean, the allegations are that the doctors as well as the nurses were agents of the hospital. Under the descriptions for negligence, it's a laundry list of different negligent activities asserted against the doctors and the hospital, as well as the next group is the hospital as well as the nurses. So if I read it, and unfortunately I thought I had it and I don't, it will say the hospital and the nurses as its agents. The hospital and the doctors as its agents. Is that what it's going to say? Individually and as agents, I believe. That's what I'm looking at right now. Are there any allegations against the hospital in the Rivera complaint that are for institutional negligence? Any? It depends. No separate allegations against the hospital. For institutional negligence. Correct. In the laundry list, there are allegations that could read as against the hospital, as far as instituting an appropriate chain of command, whether that's the nurse's failure or the hospital's failure, it's unclear in the allegations. What is the initial language of the paragraph that contains the laundry list? Dr. So-and-so was negligent in one or more of the following ways, or Dr. So-and-so and the hospital were negligent in one or more of the following ways? The doctors and the hospital were negligent in one or more of the following ways? So in the trial court, the court, correct me? Oh, yes. Your complaints, were they verified or non-verified? Non-verified. So the filing of the third amended complaint is an abandonment of all prior complaints, is that correct? I mean, that's a rule for amended complaints. Correct, that's a controlling. The filing of an amended complaint is an abandonment of all prior complaints, unless it's incorporated by reference, were they? They were not incorporated by reference. Okay. Yes, so it's the third amended complaint, and that has the equitable subrogation count under which CHIRP is requesting the $666,000. ISME, we've talked about a number of occurrences. ISME tries to avoid the equitable subrogation count by not only trying to create additional limits under the CHIRP policy, but also by claiming that the excess trust is not true excess coverage. And I think the case law is pretty clear on this. I mean, Kojima is pretty clear on recognizing that primary coverage is separate and distinct from excess coverage. Here we have a separate trust agreement that provides that it's excess over the primary trust agreement, and then the other insurance provision provides that it is excess over all other insurance, which is very similar to the traveler's case, which is cited in our brief. The one case that ISME relies on, the federal versus St. Paul, that was very unique language. That was before the court. That policy, the federal policy specifically said that it was excess only to the St. Paul policy, and then with respect to all other policies, it's shared equally or on a pro rata basis. So the language is very different in the federal versus St. Paul and not controlling. So what you have is the ISME trying to create additional limits or trying to ignore the fact that we have an excess trust to get around the equitable subrogation count. The facts are undisputed. ISME does not take issue with the allocation conducted by CHIRP other than, and they had the opportunity to take the deposition of Mr. Skirdage, who attested to how the limits were allocated. Mr. Skirdage attached to his affidavit the letter from the Plaintiff's Council taking the position that liability was equal between the two doctors and then the nurses and hospital as one unit. CHIRP advised ISME prior to entering into the settlement that CHIRP was going to allocate based on the plaintiff's position that there was really one-third liability to Dr. Baldacita, one-third to Dr. Nagayan, and one-third to the hospital and nurses. ISME was aware of that allocation before CHIRP entered into the settlement. So the fact that, and the settlement was $3 million, and ISME knew that the settlement was going to be $3 million. ISME was already aware, and so was Dr. Baldacita, that there was only $1 million in primary coverage and $2 million, or actually then everything else would be paid under the excess trust. So at the time... total liability under the primary. There was. There's a $3 million aggregate... But you didn't tell them whether you were paying a million, million, million under primary versus a million primary, $2 million excess. Early on in the litigation, CHIRP made it clear that its position was there was only $1 million in primary coverage and anything above that would be paid under the excess. So that was made clear early on. So when there's a $3 million settlement, $1 million would be paid under the primary and $2 million under the excess. CHIRP is doing the right thing here, settling for the doctor. ISME is being advised every step of the way of what's happening. They choose not to question, take issue with. And they knew that CHIRP... for any amounts that we pay on behalf of Dr. Baldacita, we're going to seek to recover those from ISME. So ISME was put on notice. So if they had questions regarding the allocation, they needed to raise those. Or if they wanted further clarification, they needed to raise those. They didn't. So CHIRP proceeded to settle. The disbursement certificates show that $1 million is paid under the primary trust, $2 million is paid under the excess trust. Mr. Skirdage doesn't do what ISME says CHIRP could have done and allocate the full $1 million to a single insured. What CHIRP does is allocate equally. It allocated liability equally. It's allocating its limits equally between the three. Was it required to do it that way? No. A carrier is required to act in good faith and not favor one insured over another. We have at least one case that maybe suggests that as long as they are paying out the limits of the liability, they can structure it any way they want to. And I can assure the court that if we would have paid the $1 million on behalf of Norwegian Hospital, ISME would really be screaming about how inequitable that was. And CHIRP was really trying to do the right thing. Liability was allocated equally. It allocated its limits equally. And we attach the affidavit. We file our briefs, our opposition briefs. ISME asks for leave to pursue additional discovery. At no time does it seek, even though they had previously noticed Mr. Skirdage's deposition, at no time do they seek that. What about their argument that the affidavit on its face does not show that he has personal knowledge and could confidently testify to the matters contained therein? It actually states that. I know it says that, but that's the boilerplate language. What is it about it? He doesn't say he personally participated. What gives him the right to testify confidently upon the matters contained in that affidavit? It's based on personal knowledge. He attests to the fact that he's familiar with the file. While it didn't, that affidavit did not set forth his role within CHIRP. Another affidavit that ISME relies on actually sets forth that Mr. Skirdage was involved with CHIRP from day one, had been the trust administrator since 1986, so predating the Rivera lawsuit. The Paschan, P-A-S-C-H-E-N, case talks about when someone of authority files an affidavit, they're deemed to be knowledgeable on those. You have the trust administrator attesting to the fact of the allocation. ISME relies on a memo that actually is going through the liabilities of the Rivera case. Mr. Skirdage is copied on that memo, and that, I believe, was in, like, 94 or 95. So it's clear that Mr. Skirdage was involved in the Rivera action from the very beginning. We believe that the Circuit Court was correct in denying the affidavit to Mr. Skirdage, and we believe that the Circuit Court was correct in denying ISME rather than taking the deposition of Mr. Skirdage so that those issues are all clarified in ISME's mind. It chooses to try to strike the affidavit so they can avoid the facts that are clearly stated in the affidavit. And we believe that the Circuit Court was correct in denying ISME's motion to strike that affidavit. What about your cross-appeal before you run out of time? Sure. The CHIRP trust agreement does not contain a contractual duty to defend doctors or other covered persons besides the hospital. I know ISME goes through numerous provisions within the trust agreement trying to create some sort of duty to defend. The provisions that they point to, and we go through in our brief so I don't want to go into too much detail, but the provisions like 5.18 that ISME pointed to, that sets forth if CHIRP is providing a defense, who is going to defend them? And you note in that provision, or covered persons is in parentheses, and that's consistent with Mr. Scourge's affidavit where he says that, yes, if a doctor is sued and vicarious liability is alleged against the hospital and the doctor isn't protected, he doesn't have other insurance, he doesn't have a valid defense, CHIRP is going to make the decision to defend that doctor. And the trust gives CHIRP that right to make that decision. Where is this coming from? You say that there's no duty but there's a right. Where is the right to defend this doctor come from? Under, and I believe it's 5.5 of the trust agreement, CHIRP is authorized to do what it needs to do to protect the assets of the trust. Contract. They can enter into contracts. They can, right? They can buy medical equipment and they can hire a security guard and they have rights to contract. But it's to protect the financial exposure under the trust. So generally from that, that's where you say that's where the right to, for example, in this case, to defend one of the doctors comes from. Just because they have the authority to spend money if they need to. Correct. To protect the trust and the liabilities of the hospital. But certainly it's not tied to any of these ideas about coverage for any of the employees at the hospital, right? And the language is really not very clear either. No, the duty to defend is very clear. It goes to the hospitals. Beyond that, it's discretionary. So if the liability of the hospital is alleged in the underlying complaint to be wholly vicarious, how in heaven's name do you defend the hospital without defending the doctors? You can't do it. It's a unified tort fee. And then there could be a business decision. Well, other than to argue there's no agency relationship. That you can do. But if you're going to defend as a principal and your liability is wholly vicarious, how do you defend without defending the agent? Well, and I think, Mr. Scourge, that affidavit goes to that. CHRP will defend if the doctor isn't being adequately protected. But that's different than a contractual obligation to defend. Well, what I'm saying is you have a contractual obligation to defend the hospital. Correct. And in a vicarious liability situation, it's impossible to defend the hospital without first defending the agent. Because it's the agent's actions that result in liability to the hospital. But there isn't a contractual obligation under the trust. There is to the hospital. To the hospital, but not to other insurers. You can't discharge that obligation without first defending the agent. So if you're obligated to defend the hospital, and you must defend the agent in order to defend the hospital, then in that particular case, is it a quantum leap in logic to say you're obligated to defend the agent? It would make sense to do that. But if, like in this case, Dr. Baldacita was being defended, and he was being adequately defended. So under the CHIRP trust agreement, there was no duty for CHIRP to step in and defend. And that's really where this equitable contribution claim, there needs to be contractual duties to defend under both contracts in order to give ISMI the right to seek contribution from CHIRP. There was no contractual obligation under the CHIRP trust agreement. So ISMI, while it attempts to try to imply a contractual duty to defend, it's just not there. And that's where we think that the circuit court erred in looking at 5.18 to imply a duty to defend when it doesn't exist. And I would just point out to the court, the Enright case that ISMI cites to, the Shapiro case is more on point, and the Shapiro case actually says that you look to. Now, in the Enright case, insured wasn't defined, so the court went through the analysis saying it would make sense that in a vicarious liability situation, the insurer would want to defend. But it also noted that it didn't have to address that issue, because they found that an exclusion applied, so it never got to that issue. Shapiro directly says that when insured is actually defined, then that's going to control. You're not going to try to imply and extend a duty to defend beyond what is anticipated by the contract. I think my time is up. Okay. Thank you. Thanks. Are we following response to the cross-appeal? My remarks are limited to the cross-appeal response. Okay. You have five minutes. Okay. Thank you. However you want to use your ten minutes, you can use it. All right. Thank you. Just a couple of points. On the allocation issue, let me just reiterate. Allocations must be found in settlement documents. Tell me again why. Why? Where is the language in home? I don't see the word allocate anywhere in home. Because that's where allocations occur. Allocations don't occur. Tell me why they're required. Why are you saying that? Why are allocations required? Why is it required for that? Why? The USF&G case. So it's not home? I'm sorry, what? You told us earlier it was home. It's not home? No, no, not in terms of home. It stands for numerous propositions in this case, primarily that a settling insurer, if it pays under its excess policy, must reserve rights against a co-insurer and say we're paying under an excess policy. Not only did CHRP not do that here. They represented just the opposite. Well, wait a minute. They contend that they told you early on that they interpreted their policy as having an aggregate $1 million primary liability and that they have excess policy. Once they tell you that, if they say they paid out $3 million, how could you come to any conclusion other than the fact that $2 million of it was paid under the excess? Well, because CHRP was saying the opposite. CHRP was saying it's all paid under the primary policy. CHRP never produced any excess policy until it filed its amended complaint. It never said that it is paying this settlement under an excess policy, and I would encourage the court to do that. So your opponent is wrong when she tells us that early on you were advised that they were, there was only $1 million of primary and that they had this excess insurance. The letter that counsel is referring to actually misrepresents is a strong word, and I don't, I just can't think of another word at this point, but does not accurately state the limits of the primary policy. So, and it never alert, they never alerted ISME that any money was, would ever be paid under an excess policy. So in terms of Mr. Skirdage being able to create allocations that were not, not done at the time of the settlement, it's interesting to note that Catherine Allen was the claims person on this file, and Catherine Allen was deposed in the first four years of this case before the allegations changed, before CHRP won, and she was, in fact, represented by CHRP's attorneys. She lives in the area. She has knowledge. She did not fight. When did she leave her job? Was it before the settlement? I think so. Was it, well, David Reeder, David Reeder, whose name is on the settlement allocation, or the settlement recommendation memo that we cite. He was never, I believe he's still employed by CHRP. But he was never, no affidavit was ever submitted by him. Allocations cannot be created after the fact. I think that if this Court were to say they can be created ten years after the settlement in response to a defense that an insurer in an equitable subrogation case raises, I think we open a Pandora's box. The whole issues on the duty to defend, the duty to defend, a couple of things. At page 783 of the record is a request to admit answered by CHRP in this case. And I asked CHRP, tell me, in your history, have you ever, ever, denied a doctor a defense based on the reasoning that your trust agreement does not contain a duty to defend? The answer is, no, we never have. Okay? Never have. And, in fact, they didn't do so with Dr. Ball to say that. When they denied his defense three times, three times in writing, they never said, we don't have a duty under our trust agreement, we only defend hospitals. They never said that. They only said that in response to Dr. Ball de Seda's declaratory judgment action, the very first time that was raised, four years after the settlement. And now they raise it in this case. The mend the hold doctrine applies, clearly applies. I know it is a doctrine that is not widely applied, but it is, as far as I can tell, it is meant to directly address a situation like this, a shifting of positions based on exigencies of the case that arise. Specifically, that's by contract. People in relationship in contract and the duties of good faith and fair deal, depending on their rise in the contract, et cetera. That was kind of why I started my questions about, how do we define the relationships between these people? Clearly all these cases have this equitable thing happening in them. It's something different, I think, than the mend the hold idea arising out of the contract. But the contract is between Dr. Ball de Seda and CHERP. And so they cannot say, because all this case is about, at its core, is Dr. Ball de Seda's rights. Right? He has a right not to have his personal insurance tapped if he has perfected a target tender. That's what this case is about. It's not about CHERP. It's not about ISME. It's about Dr. Ball de Seda. And so CHERP does not say to him, we are, they, now there's the contractual relationship. CHERP, Dr. Ball de Seda. We've produced evidence that Dr. Ball de Seda paid a premium for this policy. They have an obligation to say to him, if they believe it to be true, if it's a basis for denying coverage, we don't have an obligation to defend you. They never said that. What they said was, when we look at the policies, the other insurance clauses, we deem CHERP excess to ISME. And they said that, even though the Padilla case, they knew they were wrong. They knew they were wrong, unequivocally. There's no getting around that fact. One other point on the duty to defend, the term hospital is used. And I would submit it has to be, as Justice Hoffman has indicated, it has to be read so broadly as to include the hospital's agents, covered persons. Because when the trust agreement talks about settlement obligations, settlement procedures, indemnity obligations, it talks about the hospital. So, using CHERP's logic, since covered persons is not used in those provisions that relate to settlement obligations, indemnity obligations, CHERP necessarily has, to follow their logic, no obligation to settle on behalf of any covered person. If that's the case, if that's the case, the settlement paid for Dr. Baldeceda is voluntary. They can't have it both ways. They can't have it both ways. In terms of defense costs, Dr. Baldeceda's personal insurer, ISMI, was forced to defend the case because Dr. Baldeceda was told by CHERP, go to ISMI, you've got no remedy here, you've got to have ISMI defend you. CHERP rejected his tender three times when they knew it to be wrong. Case law says that those defense obligations are not properly borne by ISMI, but are the responsibility of the carrier that has been selected by the insurer. And we would submit that the circuit court was incorrect when it allowed only recovery of one half of those costs. So, in summary, we would ask that this court reverse the summary judgment in CHERP's favor, remand the case with directions to enter summary judgment in ISMI's favor, and further enter. I do have a question. What would the judgment line be if we found there was a duty to defense? Would you want us to remand to do what? Just with directions to enter judgment in ISMI's favor, and further to enter judgment on the counterclaim for fees in the full amount, not one half of the amount. Thank you very much. Counsel, thank you.